HEARD APRIL TERM, 1875.

EDWARDS *vs.* SANDERS.

The term "mortgages" in Section 26 of the Act of 1789, prescribing the order in which debts of a decedent are to be paid, embraces mortgages of chattels as well as mortgages of real estate.

Under Section 26 of the Act of 1789, prescribing the order in which debts of a decedent are to be paid, mortgages, whether of chattels or real estate, rank in the third class, and are entitled to payment out of the general estate in preference to specialty and simple contract debts.

A purchase of the mortgaged premises, by the mortgagee or his assignee, under a decree for foreclosure, does not extinguish the mortgage debt for any unsatisfied balance that may remain; and where the purchase is made after the death of the mortgagor, the unsatisfied balance retains its rank as a mortgage debt, with right to priority of payment out of the general estate over specialty and simple contract debts.

BEFORE TOWNSEND, J., AT DARLINGTON, DECEMBER, 1873.

This was a bill in equity, filed in January, 1869, by B. W. Edwards, administrator *de bonis non* of Julius A. Dargan, deceased, (who died intestate in March, 1861,) against H. E. P. Sanders and others, creditors of the intestate. The object of the bill was to call in creditors to establish their demands, enjoin them from suing at law and to wind up the estate.

A Referee was appointed to call in creditors, take testimony and report upon the claims presented.

The Referee submitted his report, bearing date November 19, 1873, in which he set forth and classified the claims that had been

presented and proved, those of the first class, entitled to priority of payment over specialty and simple contract debts, being stated under the caption "Judgments and Mortgages." In this class were included, amongst others, three claims as follows: †3. A claim for $4,821.57, due upon a bond and mortgage of real estate given by the intestate to T. C. Evans, Commissioner in Equity; †4. A claim for $2,133.71, due upon a bond and mortgage of slaves given by the intestate to T. C. Evans, Commissioner in Equity; and, †5. A claim for $929.41, due upon a bond and mortgage of a slave, also given by the intestate to T. C. Evans, Commissioner in Equity. The bonds and mortgages all bore date February 1, 1858. The rest of the facts bearing upon the questions raised by the appeal are stated in the opinion of the Circuit Court.

L. C. McCall and T. A. Woods, creditors of the intestate, excepted to the report as follows:

1. Because the Referee has erred in classing as mortgage debts the claims of Thomas C. Evans, as Commissioner in Equity, amounting on the 1st day of June, 1873, the one to $2,133.71, and the other to $929.41, the same being bonds secured by mortgages of slaves, which had matured while the said slaves were property ; and the property mortgaged having been exhausted, the debts secured thereby no longer exist as mortgage debts, but must stand as specialty debts merely.

\* \* \* \* \* \* \* \* \* \*

3. Because the claim proved as a mortgaged debt by Thos. C. Evans as Commissioner in Equity, stated as No. †3 on the class designated "Judgments and Mortgages" on the schedule of claims attached to said report, is improperly classed as a mortgage debt, the same having been extinguished by operation of law by reason of the purchase of mortgaged land by the assignee and holder of the said mortgage under proceedings to foreclose the same.

The Circuit decree is as follows:

TOWNSEND, J. A bill is now before this Court for the settlement of the estate of Julius A. Dargan, deceased. An order, in the progress of the cause, has been heretofore granted, requiring creditors to come in and establish their claims against his estate. W. E. Charles, Clerk of the Court, has submitted his report, con-

taining the names of such creditors as have, in obedience to the order, proved their claims, and a classification of the same in regard to their rank. Exceptions have been filed to the report, suggesting error as to the classification of four of the claims. The first, designated as No. †3 in his report under the class of mortgage and judgment, was a bond executed by the intestate, J. A. Dargan, to T. C. Evans, the then Commissioner in Equity, given for the purchase money of a tract of land sold by the Commissioner belonging to the estate of T. J. K. Dargan, and on the same day, to wit, first of February, 1858, executed a mortgage of the said land to the Commissioner to secure the payment of the purchase money. After the death of the obligor and mortgagor, this tract of land was sold as a part of his estate, and purchased by one J. J. McCown, who gave a mortgage to secure the payment of his purchase and made payments on same to the amount of $1,500. Afterwards the mortgage given by J. A. Dargan was, under proceedings in which the Commissioner in Equity and J. J. McCown were parties, foreclosed, and the land sold. B. W. Edwards was the purchaser at this sale and is now the owner of the land. He has also become the owner of the bond and mortgage against J. A. Dargan. This claim of B. W. Edwards has been classified by the Clerk as a mortgage debt, after allowing on it a credit of the amount of the bid of the purchaser. The second and third, designated as Nos. †4 and †5, in the same class, are bonds executed by J. A. Dargan to T. C. Evans, the then Commissioner in Equity, on the 1st day of February, 1858, for the purchase money of slaves purchased by him at a Commissioner's sale, and payable in one, two and three years from date, the payment of which bonds were secured by the execution of mortgages of the said slaves by J. A. Dargan on the same day.

The fourth, designated as No. †6 in the same class, are bonds executed by S. H. Wilds to T. C. Evans, the then Commissioner in Equity, for certain slaves purchased by him at a Commissioner's sale, with one James Bell and J. A. Dargan, the intestate, as his sureties, which bonds were dated on the 14th day of January, 1857, and payable in one, two, three and four years; and further to secure the said bond, the said S. H. Wilds executed mortgages of the said slaves. E. B. Brunson, the former Referee appointed to take proof of claims, made no report to the Court. Before him the claims above enumerated and described were established as specialty debts and not as mortgages. W. E. Charles, in his report,

alludes to this action before the former Referee and allows the same claims to be established before him as mortgage debts. The exceptions allege that there was error in this classification, and that the claims should have been allowed and classified as specialty debts and not as mortgage debts.

The exceptions will be considered *seriatim.* The first exception is: "Because the Referee has erred in classing as mortgage debts the claims of Thomas C. Evans, (numbered 4 and 5 in the schedule,) amounting to $2,133.71 and $929.41, the same being bonds secured by mortgages of slaves, which had matured while the said slaves were property; and the property mortgaged having been exhausted, the debts secured thereby no longer exist as mortgage debts but must stand as specialty debts merely."

The 26th clause of the statute of 1789, (5 Stat., 111,) furnishes a rule or guide for the appropriation to the payment of debts of the assets of an intestate or testator. Certain claims are therein specified, and when the nature of the obligation or debt is ascertained it must be arbitrarily placed within its appropriate class. In the administration of the assets of an intestate or testator's estate, this Court is governed by the requirements of the statute, for in administering legal assets the Court distributes them according to the strict rule of law. In the administration of assets that are purely equitable, it is governed by a rule peculiar to itself, founded upon the principle that equality is equity.—*Tennant* vs. *Stoney*, 1 Rich. Eq., 235. This Court, in the distribution of funds, recognizes liens, and enforces, in the same manner that a law Court would, if it had jurisdiction, all antecedent liens on property.—Story Eq., 519; *Tennant* vs. *Stoney*, 1 Rich. Eq., 235.

In the administration of the assets of an insolvent testator or intestate, mortgages, as mortgages, are not entitled to priority over rents, specialties and simple contract debts, except so far as they are liens on any particular part of the estate. After the lien is exhausted, the grade of the demand must be determined by the nature of the instrument which the mortgage was given to secure.—*Kinard* vs. *Young*, 2 Rich. Eq., 247.

To determine the question as to whether these debts of Evans are mortgage debts or mere specialty debts, the inquiry is pertinent whether the liens of the mortgages given to secure the debts have been exhausted. It is contended that they have not by seizure of the mortgaged property and its appropriation or sale by the mort-

gagee, but because the slaves so mortgaged have been emancipated and the liens are thus extinguished. What is the legal effect of a mortgage of personal property as to the title?

" The legal title to personal property conveyed by mortgage vests in the mortgagee, but the breach of the condition does not confer so absolute a right as to give a perfect and independent claim to the chattel as one holds property subject to his own control and dominion. Even if he has possession of the chattel, his title is diverted on the payment of the debt and transferred to the mortgagor. His possession, if he had it, is a qualified one, and, though he may be clothed with a mere legal title, he is a trustee for the mortgagor, who still continues to hold the equity of redemption, and who has the real and beneficial interest."—*Calhoun* vs. *Calhoun*, 2 S. C., 307.

The Act of 1712 vests the mortgagee with the complete title and ownership, if he takes possession after breach of condition and retains possession for ten years. In *Black* vs. *Hair*, 2 Hill Ch., 624, it is held: "That a creditor holding a mortgage security is a trustee, to sell not only for the benefit of the mortgagor but for his own use."

The interest in or title to the slaves in this case was a qualified one, and the mortgagee was not the owner. His mortgage was a mere pledge or security for his debts, taken with a view to recover his money and not to obtain the possession of the property itself. The mortgage debt was due on the 1st day of February, 1861. On that day there was a breach of the condition of the mortgage. The mortgagee was authorized, at that time, to seize the slaves and convert them into money, to be applied to the satisfaction of his debt, or to seize them and retain the possession of the property and appropriate it, *in specie*, to his own use. This would have operated as a satisfaction of his secured demand. In either event, after the seizure and sale or appropriation of the property, the mortgagee would have been accountable for the surplus over and above the amount of his debt. The mortgagee did not satisfy his mortgage debt by a seizure of the property, but, after condition broken, left the slaves in the possession of the mortgagor until their emancipation. When were they emancipated? In the case of *Pickett* vs. *Wilkins*, 13 Rich. Eq., 366, it was held: " That slaves in this State did not become either *de jure* or *de facto* free until 1865, when they were emancipated by the United States authorities." The slaves

continued, then, in the possession of the mortgagor more than four years after their emancipation. But this possession by the mortgagor, after condition broken, neither conferred on him an absolute beneficiary interest nor in the mortgagee an unqualified legal title. Ten years, under the statute, are necessary to confer such a title upon the latter after possession is acquired by him. In this case he never obtained possession.

But in 1865 the slaves were emancipated. This was a destruction of the property so mortgaged. A mortgage is not a general but a special lien. It is a charge upon specific property therein mentioned and described. When the specific property so mortgaged or charged is seized and sold in payment of the debt, this is an extinguishment of the lien. So when the specific property is destroyed, the lien is lost, as when the slave so mortgaged dies or the property so charged is destroyed. The lien of a mortgage in such a case would be exhausted. In this case the property in the slaves so mortgaged was destroyed by the United States authorities, and, being so destroyed, where is the distinction between this case and one in which the property dies or perishes in some other way? If the lien of the mortgage is lost by the destruction of the property in the one case, why would it not be in the other?

But it may be said the mortgagor had the benefit of the slaves, and was in the possession of them at the time of emancipation, and contributed by his own act to the loss of the slaves. The act of the government is not to be regarded as the act of any citizen. This doctrine has not been recognized in this country.—*Calhoun* vs. *Calhoun*, 2 S. C., 305. "The emancipation of slaves by governmental authority was a possible contingency, which must be assumed, from the peculiar character of the property, to have been understood by the parties treating for their sale and purchase. To whatever immediate cause emancipation is to be referred, it is not to be denied that it was effected by a power to which the citizen was bound to yield obedience and which he could not resist."—*Calhoun* vs. *Calhoun*, 2 S. C., 304. Neither the mortgagor nor the mortgagee can be said to have contributed to emancipation, and neither party should be held responsible for the governmental act which they were not able to resist and to which they were bound to yield obedience. But the mortgagee will be responsible for his laches in not taking possession of the slaves after condition broken, while they were property, or for not enforcing the mortgage by a foreclosure

and sale. He was a public functionary, whose duty it was to en-
force it immediately after condition broken. The mortgagor was
in possession, and it was neither his duty nor to his interest to have
it enforced. The mortgage cannot now be enforced by reason of
the emancipation of the slaves, and the mortgagee, therefore, loses
his lien. The mortgagor's estate should not be held responsible for
the laches of the mortgagee, or for the destruction of the property,
and to allow these as mortgage debts would practically impose this
hardship upon it.

There are other creditors of the estate; and to allow this claim to
rank as a mortgage debt, under all the circumstances, would be, to
say the least of it, inequitable so far as they are concerned.

In my judgment, the lien of the mortgages in question has been
extinguished by the emancipation of the slaves, but the creditor
is entitled to prove his claim as a specialty debt. The bond which
the mortgage was given to secure has not been paid, and the claim
will, therefore, rank as a bond debt against the intestate's estate.—
*Kinard* vs. *Young,* 2 Rich. Eq., 247; *Tennant* vs. *Stoney,* 1 Rich.
Eq., 263.

The first exception is, therefore, sustained.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

The third exception is "because the claim proved as a mortgage
debt by Thomas C. Evans, as Commissioner in Equity, stated as No.
†3 in the schedule, is improperly classed as a mortgage debt, the
same having been extinguished by operation of law, by reason of
the purchase of the mortgaged land by the assignee and holder of
the said mortgage, under proceedings to foreclose the same."

J. A. Dargan, the intestate, purchased a tract of land, and exe-
cuted a bond and mortgage to T. C. Evans, Commissioner in Equity,
to secure the payment of the purchase money. Under the bill filed
for the settlement of the intestate Dargan's estate, an order of sale
was granted. J. J. McCown was the purchaser at the sale, and exe-
cuted a mortgage of the land to secure the payment of the purchase
money. What did McCown purchase at the Commissioner's or
Clerk's sale? Nothing but the right, title and interest, whatever
that was, of J. A. Dargan. What was this?

"The equity doctrine is that the mortgage is a mere security for
the debt and only a chattel interest, and that until a decree for
foreclosure the mortgagor continues the real owner of the fee."—

Columbia, April, 1875.

4 Kent's Com., 159. In equity the mortgagee is considered as having a transfer of the property itself as a security for the debt, and, according to the intention of the parties, a qualified estate and security.— *Williams* vs. *Beard*, 1 S. C., 323.

"In the Court of Equity the equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law."— *Williams* vs. *Beard*, 1 S. C., 324.

J. J. McCown, then, purchased the equity of redemption of J. A. Dargan, which is said to be tantamount to the fee at law.

After the purchase by McCown, and the payment of a part of the purchase money, the mortgage given by J. A. Dargan to the Commissioner in Equity was foreclosed by proceedings in which the Commissioner and McCown were the only parties. B. W. Edwards purchased the land at the sale and is now the owner. At the time of the purchase, he was not the assignee of the bond and mortgage of J. A. Dargan, but has since become the owner.

What was the effect of the sale of the land under the order of foreclosure?

In this case the mortgagor, Dargan, was out of possession, but McCown claimed through him and stood in his place. The Act of 1791 changes the relation which exists between the mortgagee and mortgagor, as to the legal estate, when the latter is out of possession. When, by reason of the mortgagor being out of possession, the legal estate is vested in the mortgagee, he can occupy no other or higher position than the mortgagee at common law. All the rights and equities which attach to the one the other is entitled to, and no more; and, unless there is some covenant restraining him, he may enforce his legal rights by a possessory action or claim the reception of the rents and profits.— *Williams* vs. *Beard*.

The Act of 1791 applies exclusively to the proceedings in the Courts of law.— *Cruger* vs. *Daniel*, Riley Ch., 151.

When a mortgagee comes into a Court of Equity for a foreclosure, he does not proceed under his legal title for a recovery of the land, but to enforce the security for his debt; and the relief which he thus seeks he can obtain only by an order for the sale of the property, that the equity of redemption may be barred, and all the rights which attach to both parties will vest in the purchaser under such sale. It is the equity of redemption, which is tantamount to the fee at law, that equity acts upon in a bill for foreclosure.— *Williams* vs. *Beard*, 1 S. C., 324.

Under the sale made to B. W. Edwards, the purchaser, all the rights which attached to the mortgagor and mortgagee vested in him. Were all the parties necessary or required before the Court in the proceedings to foreclose the mortgage? In the case of *Cruger* vs. *Daniel*, Riley's Eq., 151, it is held: "A decree for foreclosure does not mean that the title to the land shall be immediately vested in the mortgagee and make the mortgagor a stranger to the land. It is for a sale. The common course is that the payment of the money due should be decreed. Then a sale.is directed, and if the land should sell for less than the debt, the mortgagee may have an execution for the residue. If it sell for more, the mortgagor is entitled to the surplus. The mortgagee, if out of possession, has a right to come for a sale of the land, that he may have his debt. So the mortgagor, if out of possession, has a right to enforce a sale, that he may have the surplus, if any. When the mortgagee is out of possession, he has a clear right to come for a sale to satisfy his debt; but he must make the proper parties ; then who would be entitled to the surplus or who have the fee of the land?

Was the estate of Dargan entitled to the surplus, if any, in this sale? or was the fee in this mortgaged land in his heirs at law at the time of the sale to Edwards? The Court of Equity ordered the equity of redemption of J. A. Dargan, then vested in his heirs, to be sold. McCown purchased it, and it was conveyed to him by the officer of the Court. The effect of this conveyance was to vest in him the real and beneficial estate, the equity of redemption of Dargan, which is tantamount to the fee at law. So that, by operation of the order of the Court, he was the purchaser of the fee in the sense in which the term is used in the case last cited. Who was entitled to the surplus, if any, over and above the mortgaged debt? If McCown acquired the right, title and interest, the equity of redemption of Dargan, he was certainly entitled to the surplus. If he was, then, entitled to the surplus, if any, and the equity of redemption, which is tantamount to the fee, was in him, was he not the proper and only party to be made in the proceedings for foreclosure? It seems so to me.— *Wightman* vs. *Gray*, 10 Rich. Eq., 586.

In what character did Evans come into the Court, except as mortgagee, asking that McCown, who was claiming through Dargan, should be barred of all equity of redemption by a sale, and

that the proceeds should be applied to the debt as a security for which the mortgage was taken and held?

The purchaser, Edwards, then, at the sale and by his deed, is vested with the equity of redemption of Dargan originally and McCown afterwards.

But Edwards is also the assignee or owner of the bond and mortgage given by J. A. Dargan to T. C. Evans. By virtue of this purchase and transfer, he has acquired all of the rights and title of Evans as mortgagee in the land sold. He stands as the mortgagee by assignment and the purchaser of the equity of redemption. By operation of law the mortgage debt is extinguished.—2 Story Eq. Juris., § 1035, b. "A purchase of the equity of redemption by the mortgagee extinguishes the mortgage debt; and the effect is the same whether the purchase is by a direct conveyance from the mortgagor or at a sale of the land under a junior judgment."—*Schnell* vs. *Schroder*, Bail. Eq., 328. The effect of a sale under foreclosure proceedings in a Court of Equity is to bar the equity of redemption and vest all the rights which attach to mortgagor and mortgagee in the purchaser. The special lien is then extinguished, and the mortgagee must recover the balance, if any is due, out of the mortgagor.

The mortgage debt of the assignee, Edwards, has been extinguished, and nothing remains but the balance due on his security. They must rank as a specialty debt.

The third exception is sustained.

It is, therefore, adjudged, ordered and decreed that the debts against the estate of J. A. Dargan, established before the Referee as mortgage debts, and particularly described in the exceptions, rank only as specialty debts, and that they be placed in that class in the schedule, and be so regarded in the distribution to be made of the fund in Court.

The plaintiff appealed.

*Spain*, for appellant:

Shall the debts marked †3, †4 and †5 in the report of the Referee stand as *mortgage* debts, as reported, or shall they be classed as *specialty* debts, as adjudged?

If not, may not the liens overreach and exclude specialty debts till those liens are satisfied out of the assets of the intestate?

The debts, *at the time of the death* of the intestate J. A. Dargan, having rank *as mortgage debts,* must so rank in the distribution of the assets of his estate without regard to *subsequent* events, whether of partial payment from collaterals or otherwise, or of loss, destruction, sale or exhaustion of the mortgaged property.

Section 26, A. A. 1789, (5 Stat., 111,) created a *statutory lien* on the assets of the intestate *at from the moment* of his death, which lien can be satisfied *only* by the application of those assets, first, to the extinguishment of all the debts in class No. 1, when those debts are so extinguished by the application of any remaining part of those assets; second, to the extinguishment of all the debts in class No. 2, and so forth, through the succeeding classes, to and inclusive of that of No. 6. Each class, in its order, being thus extinguished, any remaining balance of those assets are, by law, appropriated to the distributees and heirs of the intestate. This appropriation and this order of application are *fixed* at the time of death as to the creditors in their classes, as well as to the distributees. As in the case of creditors, so in the case of volunteers, *vested* rights are not *divested* by supervening events.—A. A. 1789, § 26, *supra;* Gen. Stat., § 3, 457; 15 Stat., 609; *Stock* vs. *Parker,* 2 McC. Ch., 384; *Tunno* vs. *Happoldt,,* 2 McC., 188; *Kinard* vs. *Young,* 2 Rich. Eq., 247; *Morton* vs. *Caldwell,* 3 Strob. Eq., 164; *Ex parte Ware,* 5 Rich. Eq., 473; *Tucker* vs. *Condy,* 7 Rich. Eq., 281; *Brown* vs. *James,* 3 Strob. Eq., 29; *May* vs. *May,* Rich. Eq. Cases, 379; *Kuhn* vs. *Law,* 14 Rich., 26.

The appellants are entitled, in virtue of the lien of their mortgages *existing at the time* of the intestate's death, to claim priority over the bond creditors, even though the mortgaged property, *since* the death of the intestate, has been sold, exhausted or destroyed.

The appellants are entitled, by virtue of their liens *on particular parts* of the estate *existing at the date* of the intestate's death, to *overreach* and *exclude* specialty creditors until satisfaction is had of their liens, and this without regard to any supervening event.— Authorities, *supra.*

By the terms of the mortgage deeds, nothing but *payment* in full is to avoid them.—1 Hill on Mortgages, 476; *Davis* vs. *Maynard,* 9 Mass., 247; *Lent* vs. *Morrill,* 25 Cal., 492; *Gillett* vs. *Powell,* Sp. Eq., 155.

*Warley,* contra:

The appellant insists that a chattel mortgage of negro slaves, given to secure the payment of a bond executed for their purchase money, is a mortgage within the meaning of the Act of 1789, and, as such, is entitled to precedence over "bonds and debts by specialty" in the settlement of estates.

According to this Act, the third class of debts in order of payment are "judgment mortgages and executions, the oldest first." All these were liens upon real estate, as we insist. At the time of the passage of the Act, the term " mortgage," unqualified by other words, had, as it has now, a fixed meaning. What was it?— Littleton, §§ 332, 205, a; 2 Thomas' Coke, 33; 7 Bac. Abr. Tit. Mortgage A., 29; Coote on Mor., 1; 1 Bouv. Inst., 347; 2 Wash. on Real Property, 36. In our statutes, the term "mortgage" always applies to conveyances of land by way of security. Mortgages of personalty are called "chattel mortgages," "bills of sale by way of mortgage," "mortgages or pledge of personal property," etc.

What did the Act of 1789 really do? In *McIntosh* vs. *Wright*, Rich. Eq. C., 388, the Court says : "In giving construction to this Act, we must have reference to the law as it stood before. Before the Act, administrators and executors were bound to pay off judgments, the oldest first, in preference to bonds or simple contract debts. A judgment obtained against the executor himself gained a preference over specialty and simple contract debts, and was ranked as a judgment. In this respect the statute has made an alteration; in other respects it seems to have *enacted the common law.*"

Why are mortgages thus preferred and entitled to satisfaction out of the personal estate?

"As the heir at law is regularly entitled to the benefit of redemption, he is also entitled to the assistance of the personal estate of the mortgagor for that purpose, according to the doctrine established in Courts of equity that the personal estate in the hands of the executor shall be employed in ease of the heir, by whatever means the heir becomes indebted as heir. *  *  *  *  *  * And on this foundation it hath been frequently held that if a man mortgage lands and covenant to pay the money, and die, the personal estate of the mortgagor shall, in favor of the heir, be applied in

exoneration of the mortgage."—7 Bac. Ab. Tit. Mortgage E., 63. The author cites 1 Vern., 36; 3 P. Wms., 360; 2 Atk., 436; 1 Ves., 251; 6 Bro. P. C., 520; 2 Bro. Ch. R., 273.

"A mortgage is a *debt* by specialty. It follows from the known rules, both of law and equity, that, as between the real and personal representatives of the debtor, the personal estate is primarily liable to the payment of the debt and must indemnify the real estate against it. All instances to the contrary are mere exceptions to this general rule."—Coote on Mor., 198, and cases cited from 2 Salk., 149; 1 P. Wms., 292; 2 Atk., 436; 2 Ch. Ca., 84; 1 Vern., 36; 2 Vern., 112.

This is sufficient as to the principle and the reason for it, as found under the common and civil law. The same principle finds expression in the Act of 1789, and our Courts have gone very far in enforcing it.—*Frances* vs. *Lehre*, 1 Rich. Eq., 271; *Lawton* vs. *Hunt*, 4 Rich. Eq., 252; *Hennegan* vs. *Harllee*, 10 Rich. Eq.

A mortgage is a subsisting lien upon some portion of the real estate. The mortgage, therefore, upon the foregoing principles, has not only this superior claim upon the personal assets, but a lien upon the land which cannot be defeated by other creditors. The difference between his rights and those of mere specialty creditors is well illustrated in the following extract: "So there is a distinction between the case where the estate is devised and there are specialty creditors and the case where it is devised and there is a mortgage on it. In the latter case, the legatees stand in the place of the mortgagee, if he exhausts the personal assets; in the former case, they do not stand in the place of the specialty creditors. The reason assigned is that a specialty debt is no lien on land in the hands of the obligor or his heir or devisee. But a mortgage is a lien and an estate in the land."—1 Story's E. J., § 565. It is this *estate in the land* which gives the mortgagee his high claim to payment out of the assets.

Can the same be said of the mortgagee of a chattel mortgage?

In *North* vs. *Drayton* (Har. Eq., 34,) the Court held that the bond of the intestate "must be satisfied out of the mortgaged negroes." Satisfied out of the chattel upon which the lien existed. So we say in this case. But inasmuch as the chattel is destroyed, the creditor has no specific lien and must take his place among the creditors according to the character of the demand for the security of which the chattels were pledged.—*Tunno* vs. *Happoldt*, 2 McC., 188; affirmed in equity in *Kinard* vs. *Young*, 2 Rich. Eq., 258.

It will not do to say that anything in the form of a mortgage must necessarily occupy the position assigned to mortgages in the Act of 1789. In *Commissioners of Accounts* vs. *Greenwood*, 1 DeS. Eq., 451, decided in 1795, our Courts held that: "The State has no prerogative to be paid out of the effects of the debtor in preference to any' of the citizens who have judgments, mortgages or other liens;" and, further, that the "Act is merely directorial to executors and administrators and does not alter the law in relation to the rights of the State and other creditors of the deceased." This is precisely what we contend for here. If "bills of sale of slaves by way of mortgage" did not, anterior to the passage of the Act of 1789, rank with mortgages and judgments, they cannot do so now by virtue of that Act, for it did "not alter the law;" but, in the language of the Court in *McIntosh* vs. *Wright*, "it seems to have enacted the common law."

In reference to the paper, No. †3, which once was a mortgage, our position is: That if the debt secured by the mortgage has not been paid, the lien of the mortgage has certainly been destroyed. The mortgaged premises are now the property of the owner by assignment of the mortgage.

"If a mortgagee who has received *equitable* satisfaction of his mortgage afterwards attempts to set it up as a subsisting lien upon the premises, satisfaction of the mortgage may be decreed so that it may be cancelled on the record of the mortgage."—*Kellogg* vs. *Wood*, 4 Paige, 578.

"The act of taking possession of mortgaged premises by a mortgagee, under a decree of foreclosure, is, by operation of law, an extinguishment of the mortgage debt."—*Derby Banks* vs. *Landon*, 3 Conn., 62.

"A decree of foreclosure, without any subsequent act *in pais*, is an appropriation of the pledge and an extinguishment of the mortgage debt."—*Swift* vs. *Edson*, 5 Conn., 531; 7 Bac. Abr. Tit. Mortgage E., 88.

We submit that in case of insolvent estates, as this, "the Courts will not apply the personal to relieve the real estate."—2 Was. on Real Property, *566; *Gibson* vs. *Crehore*, 3 Pick., 475; but that after lien creditors have exhausted their specific liens, their positions in the rank of creditors will be according to the character of their security.—*Kinard* vs. *Young*, 2 Rich. Eq., 247.

" In the sense of Courts of equity, the marshaling of assets is such an arrangement of the different funds under administration as shall enable all the parties having equities thereon to receive their due proportions, notwithstanding any intervening interests, *liens* or other claims of particular persons to prior satisfaction out of a portion of these funds."—1 Story Eq., § 558.

" The rule of Courts of equity in marshaling assets in the course of administration is, that every claimant upon the assets of a deceased person shall be satisfied, as far as such assets can, by any arrangement consistent with the nature of their respective claims, be applied to satisfaction thereof."—1 Story, Eq., § 561.

*McIver*, same side:

The questions in this case are whether debts of the intestate which had been secured by bond and mortgage, where the mortgages had lost their lien on the property mortgaged, either by the destruction of the property mortgaged or by a sale under foreclosure, can be established as mortgage debts against the estate of the intestate or must they be placed in the rank of specialty debts.

Our first proposition is that in the administration of the assets of an insolvent estate debts secured by mortgages are not entitled to priority, except in so far as they are liens on any particular part of the estate, and that after the lien is exhausted or lost the grade of the demand must be determined by the nature of the instrument which the mortgage was given to secure.—*Kinard* vs. *Young*, 2 Rich. Eq., 247; *Tennant* vs. *Stoney*, 1 Rich. Eq., 261; *Tunno* vs. *Happoldt*, 2 McC., 188; *Manigault* vs. *Deas*, Bail. Eq., 287, *292; Act of 1789, § 26, 5 Stat., 111.

As to the effect which a purchase by a mortgagee of the property mortgaged, the rule is thus stated in 2 Story Eq. Jur., § 1035, b: "An extinguishment of the debt will also ordinarily take place when the mortgagee becomes also absolute owner of the equity of redemption, for then the equitable estate becomes merged in the legal." This rule is thus stated on the authority of the following cases: *James* vs. *Marcy*, 2 Cowen, 246; *Jackson* vs. *De Witt*, 6 Cowen, 310; *Pelletrave* vs. *Jackson*, 11 Wend., 110; *Wade* vs. *Howard*, 6 Pick., 492; *St. Pauls* vs. *Viscount Dudley & Ward*, 15 Ves., 173; *Forbes* vs. *Moffat*, 18 Ves., 390; *Gardner* vs. *Astor*, 3 Johns. Ch., 53.

While this rule is stated by Story as subject to a qualification, yet it seems to have been adopted in this State without any qualification. —*Ex Parte City Sheriff,* 1 McC., 399; *Schnell* vs. *Schroder,* Bail. Eq., 338; *McLure & Brawley* vs. *Wheeler,* 6 Rich. Eq., 343; *Allen* vs. *Richardson,* 9 Rich. Eq., 53; see also *James* vs. *Johnson,* 6 John. Ch., 423.

The rule established by the case of *Morton & Courtney* vs. *Caldwell,* 3 Strob. Eq., 161, and recognized in *Wilson* vs. *McConnell,* 9 Rich. Eq., 500, is simply this: the creditor of an insolvent has the right to have a certain proportion of the assets applied to the payment of his debt, which proportion is to be ascertained by inquiring how much was due and what was the amount of the assets at the time of the death. It is not merely a right to have a certain portion of his debt paid. But this right of the creditor to a certain portion of the assets becomes divested so soon as his debt is paid or is otherwise extinguished. So here we say that the holder of the mortgage had at the death of the intestate a right to have the assets applied to it as a mortgage, but so soon as the mortgage was extinguished such right was divested.

Oct. 14, 1875. The opinion of the Court was delivered by

MOSES, C. J. We shall first dispose of the questions which are raised in regard to the mortgages of personal property. It is urged that they are not within the meaning and intent of Section 26 of the Act of 1789, (5 Stat., 116,) which prescribes the order in which "the debts due by any testator or intestate shall be paid by executors or administrators," because the term mortgage, in our statutes, always applies to conveyances of land by way of security, and never to an instrument conveying chattels for a like purpose. If the proposition is not sustained by the fact, on which alone it rests for support, it is not necessary to do more than to show that at the passage of the Act it was applied as well to mortgages of personal as of real estate. As long ago as 1698, mortgages of negroes and other chattels were recognized, and a rule prescribed as to their priority, where more than one of the same property was given.—2 Stat., 137.

Again, in 1745, (3 Stat., 664; 1759, 4 *ib.,* 89, and 1785, 7 *ib.,* 234,) provisions are made for their security as existing valid liens, operating to as full an extent, on the property which they cover, as

those of real estate. Indeed, on the very day of the ratification of the Act which prescribed the order in which payment of the debts of a decedent was to be made, the Legislature, in an Act providing for the transmission of an abstract of all judgments to the Clerk of the Court at Charleston, declared "that no judgment not so entered in the books of the said Clerk shall affect any property, real or personal, as to purchasers or mortgagees."—Stat., 256. It would thus seem that the term was applied without distinction as to the character of the security. Indeed, the expression "chattel mortgage" has never been used in this State, and is not to be found in any of its statutes. Even in the General Statutes, although the heading under Chapter 120 is of "chattel mortgages and liens," the very first provision refers to the recording of "a mortgage or other instrument in the nature of a mortgage of personal property." Even in England it is also applied to the pledge which is made of personal property for the security of a debt by loan or otherwise. Mr. Coote, in his work on mortgages, devotes a chapter to "mortgages of chattels personal," and the right of such a mortgagee to foreclose is recognized in *Kemp* vs. *Westbrook*, Betts' Suppt. to Vesey, 141; in *Dyson* vs. *Moris*, 1 Hare, 422; *Slade* vs. *Riggs*, 3 Hare, 35. Regarding them as mortgages within the designation of the Act of 1789, we fail to discover any rule or principle by which they are to be excluded from the rank to which, by its express terms, they are entitled.

It is not without some diffidence that we enter on the consideration of this point in the case, as the judgment of the Court below in relation to it was in conformity to the decision in *Young* vs. *Kinard*, 2 Rich. Eq., 258. The deference which we have been accustomed to accord to the decided cases in our own Courts, we must admit, has here lost some of its force, not only by reason of the full and convincing argument of Chancellor Johnston in the Circuit decree, but by the language of the Appeal Court in reversing it. That Court thus expressed itself: "It feels much difficulty in giving construction to the Act of 1789, recited in the decree, and is not prepared to say that, if the question were entirely open to them, the construction adopted by the Chancellor is not a fair deduction from its phraseology. But it is deemed expedient to defer to the case of *Tunno* vs. *Happoldt*, cited in the decree, as an exposition of the Court of law, leaving to that Court, or to a future occasion, the consideration of the suggestion made in this case." Notwithstand-

ing this, it is with deference we venture to say that the question raised and decided in *Tunno* vs. *Happoldt*, (2 McC., 188,) was not identical with that made in the case in which it was accepted and followed as a guide for its ruling. The point which the Court there seems to have considered was whether the mortgage deed could change the character of the note which it was given to secure, and elevate it from the class of simple contracts, to which it belonged, to the higher grade of a specialty. Concede, as we must, that it could not, still that did not decide the point made by the appeal. The note could have no preference over other simple contracts, and the rank which should be accorded to the mortgage, in the order of priority in the payment of the debts by the administrator, remained undetermined. The Act of 1789 does not interfere with liens as they existed at the death of the debtor. Whatever rights they confer are still secured to the holder, and the property, if it exists, remains subject to their satisfaction. The order of payment which it declares has no application to *liens* which could be enforced against the property on which they attached. As to those, the concluding words of the Section clearly show that they are to prevail as they existed at the death of the debtor. The order of priority was only to be observed in the application of such general assets in the hands of the executor or administrator as were not bound by any specific lien.—*Rutledge* vs. *Rutledge,* 1 McC. Ch., 471 ; *Keckley* vs. *Keckley,* 2 Hill Ch., 257 ; *Haynsworth* vs. *Frierson,* 11 Rich., 476. It is then not the lien which the Act deals with but the character of the debt, and it is that which is to determine its rank in the order of payment. It prescribes the order in which "the *debts* due by any testator or intestate shall be paid by executors or administrators." It embraces "mortgages" in the classification; they are to take precedence of "bonds or other obligations." In the Circuit opinion in *Young* vs. *Kinard,* Chancellor Johnston said : "If it *be* a mortgage, it suits the description of the Act, and is entitled to what the Act gives it, and that is a rank above not only simple contracts but bonds and all other specialties." "The assets of a deceased debtor are distributable among his creditors with reference to the rank of their demands at the time of his death."—*Tucker* vs. *Andy,* (7 Rich. Eq., 281,) affirming what is said in *Morton & Courtenay* vs. *Caldwell,* 3 Strob. Eq., 164, and *Ex parte Ware,* 5 Rich., 473.

The instruments in question here were executed by the intestate in his lifetime, and were valid and effective at his death. By the

Act they are entitled to share in the distribution of the assets in the hands of his administrator or the Court according to the rank which, by its provision, is accorded to them.

With the doubts expressed by the Court as to its judgment in *Young* vs. *Kinard*, we do not feel ourselves constrained to follow it as authority by which we must be controlled. It is with respect that we differ, and can well interpose for our justification, if necessary, its own misgivings as to its construction of the statute.

The remaining question to be considered is whether the mortgage debt of Dargan to the Commissioner, assigned to Edwards, has not been satisfied by his purchase of the land under the proceeding for the foreclosure of the mortgage, and cannot, therefore, as the respondents contend, take rank as such under the said Act of 1789. It is true that McCown, under the sale of Dargan's interest in the land, which was still subject to the mortgage of the Commissioner, acquired by his purchase only the right and title which Dargan held therein, and this was nothing more than the right to redeem. He thus held what in the Court of Equity is considered to be the real and beneficial interest, tantamount to the fee at law.— *Williams* vs. *Beard*, 1 S. C., 324. Where the mortgagee acquires this right through a Sheriff's sale, by a purchase under a judgment junior to the mortgage, the debt which it was to secure is extinguished;—the like result follows where the mortgagor releases to the mortgagee the equity of redemption.—*Mounce* vs. *McLure*, 2 McC., 423; *Schnell* vs. *Schroder*, 2 Bail. Eq., 334; *McLure, Brawley & Co.* vs. *Wheeler*, 6 Rich. Eq., 345; *Allen* vs. *Richardson*, 9 Rich. Eq., 56. The same doctrine was announced in *James* vs. *Johnson & Morey*.— 6 John. Ch., 416. All the right reserved by the mortgagor is transferred to the mortgagee, who then holds in the premises the interest both of the creditor and debtor, and there is nothing left on which the lien of the mortgage can operate. Where the sale is under a junior judgment, a third party purchasing must not only pay the bid which he has made for the only interest which the Sheriff can sell, but, to enjoy an unencumbered estate in the land, he must satisfy the mortgage, which still retains its lien. If the mortgagee purchases, to whom is such payment to be made? Not only is the lien destroyed, but the debt also. In *McLure, Brawley & Co.* vs. *Wheeler*, Chancellor Dunkin said: "As has been intimated, it makes no difference whether the mortgagee is the purchaser at Sheriff's sale or a stranger. Purchasing the equity of

redemption, a stranger would take the land subject to the obligation to discharge the encumbrance." If the mortgagee buys, the encumbrance is necessarily discharged by the operation of his own act.

The Circuit decree, applying these principles, while it holds not only that the lien of the mortgage but the mortgage debt also is destroyed by the purchase of Edwards at the sale for foreclosure, still gives effect to the bond, for the security of which the mortgage was executed. Following the authorities on which it relied for its conclusions, it would seem that the extinguishment of the bond also would have been an unavoidable consequence.

The question here is not, however, to be decided by the principles which prevail where the equity of redemption is lost to the mortgagor by its transfer to the mortgagee. Edwards, the assignee of the mortgage, holds through his purchase at a judicial sale for foreclosure, and all his rights and interests under his purchases depend upon the effect of such a proceeding. A foreclosure of a mortgage by judicial process in South Carolina differs in its results from that which prevails in England.

There, on default of payment of the debt at the time fixed by the Court, an absolute foreclosure is decreed. Action on the bond may be brought at law at the same time the bill for foreclosure is filed in equity, or it may follow. In this State, the proceeding is for the enforcement of the security for the debt. So far from the purchase or transfer through the sale of the equity of redemption, its effect is to bar and defeat it.

The interest of both mortgagor and mortgagee is sold. The title, freed and discharged of the encumbrance imposed by the equity of redemption, vests in the purchaser, the usual order, which was made, directing a sale, acting on the property.

It was competent for the plaintiff (and such is now the prevailing practice) to take a money decree, by force of which an execution could issue against the property of the mortgagor for any unpaid balance after the application of the proceeds of the sale.

If, under the prayer of the bill, a money decree cannot be given, the creditor, after a sale, may proceed at law upon the bond for any balance remaining due.—*Gray, Commissioner*, vs. *Toomer, executrix*, 5 Rich., 261; or, where the bill is not only for foreclosure but also for the payment of the debt, or includes a prayer for general relief, the plaintiff, after foreclosure, may apply to the

Court where the bill is filed for further decree for the money still due on the debt. The sale under an order for mere foreclosure does not extinguish the debt and leave the mortgagor without remedy for the unpaid balance, and such appears to be the view of Chancellor Wardlaw, from his language in pronouncing the opinion of the Court in *Allen* vs. *Richardson*, 9 Rich. Eq., 56.

We have already expressed our views in regard to the rank to which a debt secured by a mortgage of personal property is entitled under the Act of 1789 in the appropriation of the assets of a deceased debtor. In our conception, there is no difference where the mortgage is of real estate. In South Carolina, the whole estate is chargeable with the payment of debts. "By law, the lands of one deceased are assets to pay debts." They are expressly made so by 5 George, II, C. 7, and in this respect put on the same footing with real property. The Act of 1789 uses the comprehensive term "mortgages," assigns them to one rank, and in its application we do not see how any distinction can be made, whether they are of land or personal chattels.

The motion is granted, the judgment of the Circuit Court reversed, and the case remanded for further proceedings in conformity to the opinion of this Court.

*Wright*, A. J., and *Willard*, A. J., concurred.